IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SCOTT A. KONITZER,
a/k/a Donna Dawn Konitzer,

                    Plaintiff,                                    ORDER

          v.
                                                           11-cv-426-slc
GARY HAMBLIN, *et al.*,

                    Defendants.

---

Plaintiff Scott A. Konitzer a/k/a Donna Dawn Konitzer, is proceeding on federal constitutional and state law claims that the defendant prison officials failed to protect her[1] from an assault by John H. Balsewicz, a fellow inmate at the Columbia Correctional Institution. After numerous requests for extensions—many of which were granted—and a variety of other motions filed by Konitzer, defendants' January 14, 2013 motion for summary judgment is finally before the court. *See* dkt. 155. Although Konitzer filed a response to defendants' proposed findings of fact, *see* dkt. 237, exh. 2, she did not file a brief by her response deadline.[2] As the court is required to do on summary judgment, I have considered all of the facts, including those properly disputed by Konitzer, in a light most favorable to her. The bottom line is that I am granting the motion for summary judgment in part and denying it in part.

I am granting defendants' motion on the following claims, because even assuming that Konitzer's allegations are true, a reasonable jury could not conclude that any of these defendants

---

[1] At Konitzer's request, the court will refer to her using female pronouns.

[2] On August 21, 2013, Konitzer filed what appears to be an argument in response to defendants' motion, dkt. 248, and on September 16, 2013, she filed a motion that Sgt. Martin not be permitted discretionary immunity, dkt. 249. However, as I made clear in orders entered on May 31 and June 20, 2013, the court considered her response to be complete as of June 18, 2013. *See* dkts. 233 and 239. As a result, I have not considered her recent submissions.

knew that Konitzer faced a risk of serious harm (federal law) or a known danger (state law):  (1) the Eighth Amendment claims against defendants Janel Nickel, Gary Hamblin and Randy Becker; and (2) the state law claims against defendants Nickel and Becker.  The state law claims against Fraundorf and Hamblin will be dismissed on a separate ground:  Konitzer failed to name them in her notice of claim as she was required to do under state law.

I am denying defendants' motion for summary judgment on the following claims because I conclude that material facts are in dispute with respect to defendants' knowledge about the risk of harm that Konitzer faced:  (1) the Eighth Amendment and state law claims against defendants Janet Mink, Tina Martin and Chad Keller; and (2) the Eighth Amendment claim against defendant Joseph Fraundorf.  Because it was clearly established at the time of the attack that prison officials could not turn a deaf ear to an inmate's pleas for protection from real threats to her safety, I also find that these defendants are not entitled to qualified immunity from liability to Konitzer under the Eighth Amendment.  As a result, these claims remain for trial.

On three prior occasions, Konitzer asked the court to assist her in finding an attorney.  Now that this lawsuit is headed for trial, I agree that Konitzer will require the assistance of counsel.  Therefore, I will stay further proceedings in this case pending the recruitment of counsel for Konitzer.

As a preliminary matter, I note that Konitzer failed to support most of her responses to defendants' proposed findings of fact with admissible evidence.  Although she cites various affidavits and documents in her response, she failed to file these documents with the court before the expiration of her response deadline.  However, in the letter accompanying her responses, Konitzer explains that all she needed to do was "cut and paste the blue underscored sentences

to a declaration." *See* dkts. 237 at 2.  The underlined portions of her factual responses, for the most part, appear to describe matters of which she has personal knowledge and track the allegations in her complaint.  Therefore, giving Konitzer a more than generous benefit of the doubt, I will accept those allegations as true to the extent that they 1) relate to matters of which she has personal knowledge and 2) do not constitute inadmissible hearsay.  I have not accepted allegations relating to the observations of other witnesses where there is no affidavit or deposition testimony timely filed with the court.

For the purpose of deciding the motions for summary judgment, I find from the parties' submissions that the facts set out below are material and undisputed:

FACTS

## I.  The Parties

Plaintiff Scott A. Konitzer a/k/a Donna Dawn Konitzer is an inmate at the Columbia Correctional Institution (CCI).  She has gender identity disorder, for which she is receiving treatment.  *See* Compl., dkt. 1 at 1 and 8.

At all times relevant to this lawsuit, all of the defendants were employed by the Wisconsin Department of Corrections (DOC) at CCI.

Defendant Janel Nickel was the Security Director and responsible for security in the following areas of the institution:  central control, armory, Towers, perimeter, program areas, visiting, reception, training, mail and property.  She also was responsible for the development, implementation and monitoring of overall institution goals, policies and procedures as part of the institution management team.  As part of her job, Director Nickel maintained files in the

security office concerning individual inmates, including information important for institutional memory and on-going evaluation of institution and inmate needs. Such information may include correspondence from or concerning an inmate, investigative information, staff reports and other documents relevant to the inmate's safety and the institution's security.

Defendant Chad Keller has served as a supervising officer 2 (captain) and as CCI's investigative captain since 2010. His duties include the general security, custody and control of inmates; supervision of correctional officers and correctional sergeants; and investigating allegations of inmate and staff misconduct and incidents occurring in the institution. Capt. Keller reports to Director Nickel and generally obtains his assignments from Director Nickel. When investigations require the involvement of local law enforcement, Capt. Keller serves as the primary liaison with local law enforcement services on behalf of CCI. In addition, Capt. Keller is the Prison Rape Elimination Act (PREA) investigator for CCI. Although he does not frequent any single unit on a regular basis, he occasionally makes rounds on units or interacts with inmates informally in various settings within the institution.

Defendant Janis Mink was a Corrections Unit Supervisor responsible for the security, treatment and general living conditions of all inmates assigned to the units. She was responsible for all activities within three different units: Housing Unit 8, Housing Unit 9 and the Barracks (dorm area). Supv. Mink also participated in the development, implementation, and monitoring of overall institution goals, policies and procedures as part of the institution management team. Supv. Mink retired from state service and left CCI in May 2011.

Defendant Tina Martin was employed as a correctional sergeant responsible for the security, custody, control, and rehabilitation of inmates residing at CCI. She was assigned to

Housing Unit 8. Sgt. Martin also assumed lead responsibility for post operations in a particular area or during an assigned shift and performed other related work as required by her supervisors.

Defendants Joseph Fraundorf and Randall Becker were CCI correctional officers, and under the supervision of the security director, supervising officer, and/or correctional sergeant, they were responsible for the security, custody, control and treatment of inmates, supervising inmates in work or housing unit situations, escorting inmates off-grounds as required, patrolling institution building and grounds and performing other related work as required.

Defendant Gary Hamblin is the former Secretary of DOC, in which position he had responsibilities generally defined by Wis. Stat. § 15.04 and as otherwise specifically set forth in the Wisconsin Statutes and Wisconsin Administrative Code. Although Hamblin had general supervisory authority over DOC operations, he did not supervise the day-to-day operations of individual DOC institutions or employees.

## II.  Konitzer's Cell Classification

The decision to not double an inmate with another person is used as a management tool for inmate safety. Cell classification decisions are based on a review of past behaviors or special circumstances. As security director, Nickel supervises and has input regarding whether an inmate is classified as a "do not double," a "pair with care" or is deemed eligible for a cell mate. An inmate's cell classification status is based upon a multi-disciplinary review involving the security staff, the clinical services/psychological services staff and occasionally medical staff. Nickel bases her decision on what she judges to be the best interests of the institution, the safety of inmates and staff and the needs of the particular inmate.

5

Although Konitzer had requested a roommate, Nickel denied the request after speaking with Konitzer, unit security personnel and psychological services personnel. Therefore, during 2010, Konitzer was housed in a single cell on Housing Unit 8 and was classified as a "do not double," meaning that she was not eligible to have a roommate. Nickel's primary reason for the classification was concern for Konitzer's personal safety and the safety of other inmates—Nickel sought to prevent other inmates from taking advantage of or physically assaulting Konitzer.[3] Nickel also believed that Konitzer was prone to aggression.[4]

### III. Balsewicz's Disciplinary History

Inmate John Balsewicz was transferred to CCI in 2005, after having gotten into an altercation with his cell mate at another institution. The nature of the altercation was relatively minor, and the rest of Balsewicz's conduct report history was unremarkable. Balsewicz's record demonstrates that prior to 2010, he had only infrequent disciplinary incidents separated by substantial periods of time (between one and four years). Prior to 2010, his last incident was in 2008 (hitting another inmate with a radio) and the disciplinary penalties imposed at that time were not severe compared to the conduct histories Nickel routinely saw as Security Director with respect to most maximum security inmates. None of Balsewicz's prior disciplinary incidents

---

[3] Konitzer challenges Nickels' decision to place her in a single cell, arguing that Nickel ignored a psychologist's opinion that Kontizer's suicidal tendencies favored placing her with a cell mate. Konitzer alleges that she needed a double cell because she was at risk for suicide, stress-induced fainting spells, blood clots and stroke. I have not considered Konitzer's argument because it does not directly contradict defendants' proposed fact, it improperly introduces new facts and it does not relate to the claims on which she has been allowed to proceed.

[4] Konitzer disputes the fact that she actually has a history of assaulting other inmates.

involved Konitzer.  After Balsewicz arrived at CCI, he was housed on Unit 8 and classified as "pair with care," meaning that he was eligible for a roommate but that extra care needed to be taken in cell mate selection.

It is common in a maximum security setting for inmates to engage in disruptive and assaultive behavior.  CCI houses approximately 800 inmates, each of whom is assigned to CCI based upon his history of violence.  It is impossible for staff at CCI to learn, let alone retain the specific disciplinary history of each inmate who is imprisoned at CCI.  DOC and CCI staff consider every inmate at CCI to be dangerous and potentially violent, which is why those inmates have been assigned to a maximum security institution.

Unit personnel and line officers at DOC institutions often do not have any knowledge of any given inmate's general disciplinary background and history unless those in a supervisory position have determined that specific restrictions need to be placed on an inmate based on disciplinary issues.

## IV.  2010 Sexual Assault Investigation on Housing Unit 8

In 2010, an inmate named Earl Everingham in Housing Unit 8 wrote in a letter to another inmate at CCI, stating that a group of eight inmates in Housing Unit 8, including Konitzer and Balsewicz, were engaging in sexual activities with each other.  After learning about the allegations, Director Nickel asked Capt. Keller to investigate, to interview the inmates potentially involved and to make recommendations based on his conclusions.  Supv. Mink assisted Capt. Keller in the investigation, which began August 26, 2010 and officially ended in

April 2011 with the issuance of a written report.[5]  The investigation did not substantiate any of Everingham's allegations.

Capt. Keller met with Konitzer twice during the investigation and remembers that Konitzer referred to a couple of inmates as talking too much and lying.  Konitzer did not admit to any inappropriate conduct and did not report any inappropriate conduct by anyone else.

As a precautionary measure, some of the inmates implicated by Everingham were moved to other areas of the institution during or shortly after the investigation, but Director Nickel left Balsewicz and Konitzer on Unit 8 because staff had not detected any safety concerns involving either of them.[6]  At no time either during or after the investigation did any security staff member report to Director Nickel that Konitzer had claimed that she feared for her safety prior to the attack by Balsewicz.[7]

## V.  Balsewicz Attacks Konitzer

On November 12, 2010, in Housing Unit 8, Balsewicz attacked Konitzer during evening meal time.  Immediately after the attack, Balsewicz was removed to Temporary Lock-Up (TLU), pending an investigation of his conduct.  After Konitzer received medical treatment she was

---

[5] Konitzer alleges that both Supv. Mink and Capt. Keller told her in late August 2010 that the investigation was concluded, that the complaining inmate was not credible and that they were moving that inmate to a different housing unit for spreading malicious rumors.  Even if these allegations are correct, they do not refute defendants' proposed fact that the investigation officially concluded in April 2011 with the issuance of the written report.

[6] The parties dispute whether Capt. Keller asked individual inmates (or at least Konitzer) about whether they had personal safety concerns.

[7] Konitzer attempts to dispute this fact with the affidavit of another inmate; however, she has not produced the affidavit.

placed in TLU until staff could assess her continued safety on Unit 8.  After the attack, Nickel directed that a special placement needs (SPN)[8] be issued to keep Balsewicz and Konitzer separate.  This SPN remains in place to this day.  Balsewicz is not currently housed at CCI.

Konitzer was returned to her regular cell on Unit 8 on November 18, 2010, after security had determined that there was no further danger to Konitzer and after Konitzer had confirmed that she did not fear for her safety and wished to return to the unit.  On December 29, 2010, Konitzer was moved to Housing Unit 9 as a precautionary safety measure. She is still housed there.

## VI. Defendants' Personal Knowledge and Actions

### A.  Security Director Janel Nickel

Director Nickel was out of the institution from November 6 to November 15, 2010, so she did not learn about Balsewicz attacking Konitzer until she returned.  Konitzer had never written to Director Nickel about any threat by Balsewicz to attack Konitzer, and no security staff member reported to Director Nickel that Balsewicz had made any threats toward Konitzer– or toward any other inmate–prior to his attack on Konitzer.[9]  Nickel found no security records

---

[8] DOC institutions uses SPNs to place and commemorate conditions on inmate placements. Among other things, SPNs are used identify inmates who need to be kept apart while they both are in the system.  SPNs can be initiated by security staff or by inmate request.

[9] Although Konitzer cites her affidavit to support her claim that Supv. Mink and Capt. Keller reported to Director Nickel that Balsewicz's behavior was becoming more threatening and that Konitzer believed that violence would occur if she was not moved, Konitzer does not explain how she would have personal knowledge of this conversation or report.  As a result, her averment is at best hearsay, and at worst speculation.

or correspondence indicating that Konitzer feared for her safety prior to the attack.  There also was no SPN request that she be kept away from Balsewicz.

Nickel has no recollection of being aware in November of 2010 of the details of any of the specific events that are contained in the list of Balsewicz's previous conduct reports. Director Nickel routinely reviewed and approved or rejected conduct reports issued by staff, looking at about 175 conduct reports each month.  Thus, Director Nickel's ability to recall any details about specific inmates' histories several years later is limited.

### B.  Captain Chad Keller

During Capt. Keller's investigation of allegations of sexual assault on Unit 8, Konitzer did not tell Capt. Keller that she felt threatened by Balsewicz.[10]  Also during the investigation, Capt. Keller learned from Konitzer and several other inmates that Balsewicz and Konitzer walked together on the track at outside recreation and that they spent time in the dayroom together.[11]

Prior to Balsewicz's attack on Konitzer, Capt. Keller did not have any personal knowledge of Balsewicz's specific disciplinary history.  Capt. Keller did not inquire into Balsewicz's or any

---

[10] Konitzer alleges that in mid-October 2010, she told Capt. Keller about Balsewicz's "threatening conduct" and her belief that "there would be a violent outcome if she wasn't moved away from Balsewicz" when she was on a "bogus pass" to the health services unit.

[11] Although Konitzer is correct that the reports to Capt. Keller would be hearsay if offered for their truth, that is not why the state has submitted this evidence.  The court will not infer that Balsewicz and Konitzer actually spent time together, but what Capt. Keller was told at the time–whether true or not–is relevant to what he knew or should have known about whether Balsewicz posed a threat to Konitzer.

other implicated inmates' disciplinary histories as part of his investigation into the allegations of sexual misconduct among Unit 8 inmates during 2010.

### C.  Supervisor Janis Mink

In November 2010, Supv. Mink's usual work hours were 7:45 a.m. to 4:30 p.m.  She typically began her day in her office within the staff area between Housing Units 8 and 9 and finished her day in the Barracks.  When Supv. Mink was on Unit 8, she observed that Konitzer and Balsewicz appeared to be friendly with each other and staff.  At no time prior to November 12, 2010 did Supv. Mink receive any correspondence from Konitzer concerning complaints related to Balsewicz or indicating that Konitzer feared Balsewicz.[12]  Supv. Mink did not learn of any inmate safety concerns through her role in the sexual assault investigation.

Supv. Mink reviewed various requests from Konitzer about her living conditions.  Sometimes these requests came from Konitzer directly and sometimes they were passed along to Supv. Mink from correctional officers assigned to the unit.  At some point prior to November 12, 2010, Konitzer asked to be moved to another unit and to be allowed to room with another inmate.

Supv. Mink was aware that Konitzer washed her own female undergarments in her cell to avoid problems by other inmates who would do the laundry as part of prison employment.[13]

---

[12] The parties dispute whether Konitzer repeatedly told Supv. Mink during discussions in the Unit 8 conference room that she was afraid of Balsewicz and that his aggressiveness was escalating.

[13] The parties appear to dispute whether Supv. Mink knew that Konitzer did this specifically to avoid having Balsewicz (who worked in the laundry) wash her undergarments because Balsewicz was "obsessed" with her.

When Balsewicz attacked Konitzer on November 12, 2010, Supv. Mink already had left work.  She learned of the attack in an email sent by Lieutenant Edwin Tetzlaff at 10:45 p.m. on November 12, 2010.

Prior to the attack, Supv. Mink did not have personal knowledge of Balsewicz's disciplinary history.  As Unit Manager, Supv. Mink normally would be made aware of prior disciplinary incidents involving an inmate only if security supervisory personnel flagged particular needs or risks associated with that inmate assigned to her unit.  In addition, officers regularly assigned to Supv. Mink's unit would report to her if they personally observed problematic behavior or if an incident occurred on a unit under her supervision.

### C.  Sgt. Tina Martin

In May 2010, Nickel received a complaint from Konitzer alleging that Sgt. Martin was targeting her.  Nickel reviewed the allegations and found them to be unfounded.

During 2010, Sgt. Martin regularly worked the second shift at CCI from 2:00 p.m. to 10:00 p.m.  On the afternoon of November 11, 2010, Sgt. Martin was seated at the officers' desk in the dayroom in Unit 8 where Konitzer was seated at a table.  Sgt. Martin saw Balsewicz come out of the laundry room where he was working, approach Konitzer and briefly speak to her.[14]  Balsewicz walked back into the laundry room and Konitzer complained about Balsewicz to Sgt. Martin.[15]  Sgt. Martin did not record the incident in writing or report it to others.  She

---

[14] The parties dispute whether Balsewicz sat down next to Konitzer at the table or instead stood and acted in a threatening manner.

[15] Sgt. Martin avers that Konitzer yelled at Balsewicz and then approached her to complain that Balsewicz was fixated on washing Konitzer's female undergarments and stated "that little fag won't leave

saw nothing further during her shift on November 11, 2010 that would suggest further problems that day between Konitzer and Balsewicz.

As a general matter, Sgt. Martin does not obtain any information concerning the underlying crimes for which an inmate is serving time, or the details about those crimes. Given the number of inmates that Sgt. Martin deals with on a daily basis, she does not memorize the details of each inmate's crimes, including Konitzer and Balsewicz. During the time period that Balsewicz lived on Unit 8 under Sgt. Martin's supervision, she did not observe him exhibit any threatening or violent behavior to other inmates or staff. Prior to the attack, Sgt. Martin did not receive any reports from co-workers or officers on other shifts indicating that Balsewicz posed any danger to anyone or was exhibiting threatening behavior. Sgt. Martin did not have any personal knowledge of Balsewicz's disciplinary record in prison.

On the day of the attack, Sgt. Martin was in the dayroom when the evening meal was beginning. Balsewicz was working in the laundry handing out rolls of clean clothing to inmates after they finished their meals. Immediately prior to the attack, Sgt. Martin was standing at the end of the meal line near the serving door, marking on a clipboard inmate requests for showers, dayroom and razors. Konitzer signed up for dayroom and then joined the meal line. Sgt. Martin observed Konitzer fill a meal tray and sit down at a table. Balsewicz came out of the

---

me alone." According to Sgt. Martin, Balsewicz overheard the "fag" comment. Sgt. Martin avers that she spoke to Balsewicz that afternoon and told him to leave Konitzer alone and to ignore the name calling. Konitzer disputes Sgt. Martin's account and alleges that she did not approach Sgt. Martin until after Balsewicz had left the room. Although Konitzer does not dispute referring to Balsewicz as a "fag," she alleges that she  never discussed the washing of her undergarments with Sgt. Martin.

      The parties also dispute whether, after hearing Konitzer's complaint on November 11, 2010, Sgt. Martin told Balsewicz to leave Konitzer alone and stay in the laundry and do his assigned work. *See* Balsewicz depo., dkt. 154 at 55-56; 68-70. They also dispute whether 30 minutes before the attack on November 12, 2010, Sgt. Martin told Balsewicz about Konitzer calling him a "fag." *Id.* at 68-73.

laundry room and attacked Konitzer while Konitzer was seated.  The attack was unprovoked and happened without warning.  Balsewicz jumped on top of Konitzer, knocking Konitzer onto the floor.  He repeatedly punched Konitzer and slammed Konitzer's face into the floor.

Pursuant to DOC security policy, Sgt. Martin's primary responsibility as the only officer on site was to call for assistance by hitting her body alarm and to secure the scene by clearing the dayroom of the other inmates in the area.  Sgt. Martin immediately activated her body alarm when the attack happened.  She then tried to pull Balsewicz off of Konitzer while repeatedly ordering him to "Stop!"  Balsewicz eventually stopped.[16]  This direct intervention contravened Sgt. Martin's training and DOC policy, which required Sgt. Martin to wait for back up to arrive before attempting to break up an altercation.  Sgt. Martin was chastised after the incident for personally intervening before help arrived.

Sgt. Martin hit her body alarm repeatedly during the attack because she was anxious to have officers respond quickly due to the nature of the attack. (In other words, the body alarm was functioning properly).  Other officers responded quickly, although it felt like an eternity to Sgt. Martin.

### D.  Officer Joseph Fraundorf

On November 12, 2010, Officer Fraundorf was working in the control bubble on Housing Unit 8 and had a full view of the unit.  He was not allowed to leave the bubble area

---

[16]  Konitzer disputes what actually caused Balsewicz stop hitting Konitzer—Sgt. Martin's intervention or the arrival of the responding officers–but this is irrelevant to the summary judgment decision.

because this was where the unit's doors were controlled.  Officer Fraundorf witnessed Balsewicz walk up to Konitzer during the evening meal time and assault Konitzer.  Because the only officer in the area at the time was Sgt. Martin, Officer Fraundorf hit the alert tone button, which notified other staff that assistance was needed on Housing Unit 8.  Right after Officer Fraundorf hit the button, Sgt. Martin ordered Officer Fraundorf to "hit the button."  Officer Fraundorf informed her that he had already hit the button and unlocked the door for additional staff to get in.  In Officer Fraundorf's opinion, Sgt. Martin did everything she could to stop the altercation between Balsewicz and Konitzer, including putting herself into the mix when she attempted to pull Balsewicz off of Konitzer.

### E.  Officer Randall Becker

During Officer Becker's employment at CCI, he regularly worked on Housing Unit 8, but he was not working second shift on November 12, 2010 and he did not learn of the assault on Konitzer until the next day.  From Officer Becker's personal observations of the contact between Konitzer and Balsewicz prior to the attack, he never concluded that Balsewicz posed any threat to Konitzer.  To the contrary, the two appeared to be friends.  Officer Becker often would see Konitzer and Balsewicz visiting and walking on the track together during outside recreation, during inside recreation or sitting and talking in the day room.

One of Officer Becker's duties was to supervise inmate jobs on the unit.  During the months before the attack, Konitzer expressed interest in applying for a job as a utility worker, a custodial position on the unit.  Balsewicz worked this position and showed Konitzer how to

mix the cleaners and scrub showers.[17]  During the time Balsewicz was working with Konitzer on the utility job, Officer Becker never personally observed any behavior by either of them that concerned him.  However, Konitzer told Officer Becker that Balsewicz was hanging around outside her cell on the "A" wing of the unit and Konitzer was uncomfortable with that.

Officer Becker talked this situation over with Sergeant Teska, his supervisor on the unit. After this discussion, Balsewicz was moved to the B wing to clean, in order to minimize the amount of time Balsewicz would be on Konitzer's side of the unit.  When Konitzer was hired and training for the utility job, she was assigned to the A wing.  Konitzer also complained to Officer Becker that she did not want Balsewicz washing her personal female undergarments after Balsewicz became the laundry worker on the unit.  As a result of Konitzer's laundry concern, she washed her undergarments in her cell.  When Officer Becker notified Balsewicz about the change in the cleaning assignment and laundry arrangements, Balsewicz was agreeable to the changes and showed no anger or concern.

At no time prior to the attack did Konitzer tell Officer Becker that she feared Balsewicz may attack her.[18]  Officer Becker also did not observe any behavior by Balsewicz that appeared violent or threatening toward any inmates.  Balsewicz generally had good behavior on the unit and that is why he had been allowed to hold inmate jobs such as utility and laundry worker which gave him a certain amount of free movement within the housing unit.  Officer Becker did

---

[17]  The parties dispute whether Konitzer quit the utility job because of Balsewicz or because she could not get up in the morning.

[18]  Konitzer attempts to dispute this with her deposition testimony that she told Officer Becker that she felt very uncomfortable with Balsewicz, Balsewicz was hostile towards her and he was telling people stuff about her that wasn't true.

not believe that Balsewicz was a threat to Konitzer or that Konitzer feared Balsewicz.  If Officer Becker had perceived that there was a problem between Konitzer and Balsewicz, he would have brought it to the attention of the unit manager and security office.

Officer Becker was not aware of Balsewicz's past victims, the details behind his crimes or his prison disciplinary history.  Given the number of inmates that Officer Becker deals with on a day to day basis, he does not memorize each inmate's history or crimes.  From a security standpoint, the most important factors inside the prison are an inmate's history in custody and the conduct the officers observe concerning the inmate.

### F.  DOC Secretary Hamblin

DOC Secretary Hamblin had no knowledge of and was never personally involved in any decision related to Konitzer.  Konitzer did not write to Hamblin personally about any concerns with Balsewicz or any safety concerns at CCI.  Based on his review of the Inmate Complaint Review System, Hamblin knows that Konitzer filed complaints with respect to the assault that occurred on November 12, 2010.  However, Hamblin had no personal involvement with respect to any investigation or final decisions with respect to those complaints.

### VII.  Notice of Claim

Betty Kruse is employed by the Wisconsin Department of Justice as a paralegal assigned to the Civil Litigation Unit, Legal Services Division.  Her duties include receiving, filing and keeping a record of notices of claim required to be filed with the Attorney General pursuant to Wis. Stat. § 893.82.  After searching her records, Kruse found a notice of claim related to this

lawsuit that Konitzer served by certified mail and postmarked December 30, 2010.  Konitzer did not name defendants Officer Fraundorf or Hamblin in her notice of claim.

OPINION

## I. Summary Judgment Standard

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'"  *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)).  In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party.  *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007).  Even so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, she must come forward with enough evidence on each of the elements of her claim to show that a reasonable jury could find in her favor.  *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

## II. Eighth Amendment

The Eighth Amendment to the United States Constitution requires the government to "provide humane conditions of confinement; prison officials must . . . 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832, (1994).  In *Farmer*, the Supreme Court held that the Constitution requires prison officials to protect prisoners from "substantial risk[s] of serious harm," such as a physical assault.  511 U.S. at 825. When prison officials have actual knowledge of a substantial risk of harm, they must take reasonable steps to prevent that harm.  *Langston v. Peters*, 100 F.3d 1235, 1237-38 (7th Cir. 1996) (citing *Farmer,* 511 U.S. at 837).  Failure to do so constitutes deliberate indifference and violates an inmate's Eighth Amendment rights.  *Id.*  However, not every harm caused by another inmate translates into constitutional liability for the corrections officers responsible for a prisoner's safety.   *Farmer*, 511 U.S. at 834.

To establish that a prison official was deliberately indifferent to her safety, a prisoner must prove that the official not only was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, but also that the official drew that inference. *Farmer*, 511 U.S. at 837.  Stated differently, "the inquiry is not whether individual officers *should have* known about risks to [the inmate's] safety, but rather whether they *did* know of such risks." *Grieveson v. Anderson,* 538 F.3d 763, 775 (7th Cir. 2008) (emphasis in original) (citing *Farmer*, 511 U.S. at 842-43).  Where the victim and assailant are readily identifiable, as in this case, the custodial official must have knowledge of a "clearly particularized risk," often drawn from complaints by that inmate about specific threats to her safety.  *Brown v. Budz,* 398 F.3d 904, 914-15 (7th Cir. 2005); *McGill v. Duckworth,* 944 F.3d 344, 349 (7th Cir. 1991).  "A 'mere

19

possibility of violence' or the occurrence of a random act of violence is not sufficient to impose liability on prison officials." *Miller v. Turner*, 26 Fed. Appx. 560, 563 (7th Cir. 2001) (internal citations omitted).  *See also Young v. Monahan*, 420 Fed. Appx. 578, 582 (7th Cir. 2011) (plaintiff's complaints not so specific as to suggest high probability of assault; threat that plaintiff reported was vague and had been made months before); *Grieveson*, 538 F.3d at 776 (upholding summary judgment for defendants where prisoner "told jail officials only that he was afraid and that he wanted to be moved"); *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003) (guard's knowledge from plaintiff of cell mate's veiled, nondescript threat did not support inference of reckless disregard).  Further, mere negligence (for example if a prison guard should know of a risk but does not) is not enough to state a claim of deliberate indifference under the Eighth Amendment.  *Daniels v. Williams*, 474 U.S. 327, 332, (1986).  It is also not sufficient to show that the prison guard merely failed to act reasonably.  *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995).

I will address the knowledge of each defendant separately:

### A.  Security Director Janel Nickel

Konitzer has failed to submit sufficient admissible evidence from which a jury could find that Director Nickel actually received notice of Balsewicz's threatening behavior and subjectively appreciated that Konitzer faced a substantial risk of harm from Balsewicz.  The undisputed facts show that prior to the November 2010 attack, neither Konitzer nor correctional staff told Director Nickel that Balsewicz had threatened Konitzer or any other inmate, or that Konitzer feared for her safety.  Similarly, there are no security records indicating that Konitzer feared for

her safety prior to the attack.  Konitzer tries to implicate Director Nickel by stating that Supv. Mink and Capt. Keller told her (Konitzer) that they had told Director Nickel about Balsewicz's threats.  (She also indicates that another inmate overhead these conversations but that witness did not submit an affidavit to this effect in a timely fashion.)  Regardless the source, however, all of this is inadmissible hearsay.  I also note that Director Nickel's role as security director does not make her liable for the actions of her subordinates because there is no doctrine of supervisory strict liability under § 1983.  *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) (liability depends on an individual defendant's actions, not the people s/he supervises); *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir. 1984).

Konitzer also suggests that Director Nickel should have known Balsewicz was prone to violence because of his conduct history at CCI and other institutions.  Director Nickel claims that she had no particular knowledge of Balsewicz's disciplinary history.  Even assuming, *arguendo*, that Director Nickel knew or should have known that Balsewicz had such a history, there is no indication that he posed a specific threat to Konitzer.  Prior to 2010, Balsewicz had infrequent disciplinary incidents between one and four years apart and none involved Konitzer. The most recent incident had been in 2008, and the disciplinary penalties imposed at that time were not severe.  Although Balsewicz and Konitzer were housed in the same unit, they did not share a cell, and Director Nickel had taken precautions by classifying Balsewicz as "pair with care."  There is no evidence that Director Nickel received reports that Balsewicz posed a threat of violence to any inmate, let alone to Konitzer.

Finally, Konitzer cannot succeed on her theory that housing her in a single-cell made her a target for the attack by Balsewicz.  Konitzer has failed to adduce any evidence suggesting that

21

having a cell mate would have made a difference or somehow could have prevented this attack, which took place in a common room during dinner. The undisputed facts show that Director Nickel classified Konitzer as "do not double" after consulting other professionals in order to protect her from possible attacks from other inmates.

In sum, there is no evidence that Director Nickel had particular knowledge that Balsewicz posed a threat to Konitzer, and I am granting summary judgment in her favor.

### B. Supervisor Mink and Capt. Keller

I must assume for summary judgment purposes that Konitzer's version of the disputed facts is correct:

(1) In mid-October 2010, Konitzer told Capt. Keller about Balsewicz's "threatening conduct" and that "there would be a violent outcome if she wasn't moved away from Balsewicz;"

(2) Konitzer repeatedly told Supv. Mink during discussions in the Unit 8 conference room that she was afraid of Balsewicz and that his aggressiveness toward her was escalating; and

(3) Supv. Mink was aware that Konitzer washed her female undergarments in her cell to avoid problems with Balsewicz who worked in the prison laundry room.

In addition, Konitzer testified at her deposition that she told Capt. Keller that Balsewicz's conduct was threatening because Balsewicz was following her around and loitering outside her cell, and that Balsewicz might assault her if she was not moved off the unit. Dkt. 153 at 192-96.

These allegations are sufficient to place into dispute Capt. Keller's and Supv. Mink's knowledge of the potential threat to Konitzer. A reasonable jury could conclude from Konitzer's allegations that Capt. Keller and Supv. Mink knew that Balsewicz posed a specific risk of harm

to Konitzer.  As a result, their motion for summary judgment on the deliberate indifferent claims must be denied.

### C.  Sgt. Martin

Konitzer alleges that on the day before the attack, she told Sgt. Martin that Balsewicz had approached her in a threatening manner in the dayroom and admits that she told Sgt. Martin that Balsewicz was a "little fag" who would not leave her alone.  Konitzer cites testimony from Balsewicz that 30 minutes before the attack on November 12, 2010, Sgt. Martin informed Balsewicz in front of other inmates that Konitzer had complained about him and called him a "fag."  Although Konitzer also attempts to establish that Sgt. Martin knew about Balsewicz's threats against Konitzer and his past history of violence toward other inmates, she bases these accusations on what she claims Supv. Mink shared at staff team meetings.  This is inadmissible hearsay and cannot be used to establish Sgt. Martin's knowledge.

Although the evidence is weak, I will allow Konitzer to proceed to trial on her allegation that Sgt. Martin acted with deliberate indifference.  Assuming, as the court must, that Konitzer's allegations are true, then a reasonable jury could conclude that Sgt. Martin created a risk of serious harm to Konitzer by telling Balsewicz that Konitzer had called him a "fag," especially since she knew that Balsewicz had just had threatened Konitzer the day before.

Although Konitzer has suggested in her complaint and other filings that Sgt. Martin failed to protect Konitzer in responding to the attack in the dayroom, she seems to abandoned this theory on summary judgment.  In any event, nothing in the record before the court indicates that Sgt. Martin acted with deliberate indifference to Konitzer's safety during the attack.  Sgt.

Martin avers, and Konitzer does not dispute, that she hit her body alarm repeatedly as soon as Baslewicz jumped Konitzer in the lunch room.  Both Officer Fraundorf and Sgt. Martin aver that Sgt. Martin went beyond the call of duty and tried to pull Balsewicz off of Konitzer while repeatedly ordering him to stop his attack.  These undisputed facts establish that Sgt. Martin promptly and courageously threw herself into the fray at genuine risk of serious personal harm in order to protect Konitzer.  Konitzer has repaid Sgt. Martin with a lawsuit.  Under F. R. Civ. Pro. 56, the court is constrained to allow the lawsuit to proceed.


### D.  Officer Fraundorf

Konitzer alleges that because of his prejudice against her sexual identity, Officer Fraundorf deliberately failed to open the unit door in a timely manner to allow responders to stop the attack on plaintiff.  In support, Konitzer avers that she saw Officer Fraundorf watch the attack for at least two to three minutes before opening the entry door so that the first responder team could get onto the unit.  (The record is silent with respect to the exact time of arrival of the first responders.)  Defendants argue that Konitzer could not have seen what Officer Fraundorf was doing because she was being beaten up at the time.  Although they raise a valid point, this is a matter of weight and credibility for the jury to decide at trial.  Konitzer's accusation of anti-GID prejudice is sheer speculation, but her averments of an intentional delay by Officer Fraundorf raise a dispute of material fact that prevents summary judgment.  *See Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (noting that it is deliberate indifference if prison official "effectively condones the attack by allowing it to happen").

24

### E.  Officer Becker

Konitzer alleges that she told Officer Becker that she felt very "uncomfortable" with Balsewicz, that Balsewicz was "hostile" toward her and that he was telling people "stuff about her that wasn't true."  Without more, these statements, either singly or in combination were insufficient to alert Officer Becker that Konitzer was in imminent danger of an attack by Balsewicz.  Although the allegation that Balsewicz was "hostile" is closer to the line, it is not clear whether Konitzer truly felt that she was in danger.  Hostility can be manifested in words and attitude without any genuine threat of violence or physical harm.  By contrast, the statements that Konitzer alleges she made to Capt. Keller and Supv. Mink were much more specific and described a direct threat to her physical safety.  Konitzer does not state that she told Officer Becker that Balsewicz had threatened her or that she felt that he would become violent if left unchecked.  Although Officer Becker admits that Konitzer complained to him about Balsewicz hanging around her cell, Officer Becker responded reasonably upon learning of Konitzer's discomfort.  Officer Becker discussed the situation with his supervisor, and they moved Balsewicz's cleaning assignment to a different tier so that he would not have occasion to loiter near Konitzer's cell.  Given these facts, a reasonable jury could not find that Officer Becker was deliberately indifferent to Konitzer's safety.  He is entitled to summary judgment.

### F.  DOC Secretary Hamblin

Konitzer was granted leave to proceed on a deliberate indifference claim against defendant Hamblin in his official capacity for injunctive relief.  *See* dkt. 61 at 4-5.  Presumably, Konitzer wanted to ensure that she was at no further risk from Balsewicz.  That concern has

been mooted by Balsewicz's transfer to another institution. *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (if prisoner transferred to another prison, his request for injunctive and declaratory relief is moot unless he can demonstrate likelihood of re-transfer). As defendants note, even if Balsewicz were to return to CCI, he would not be placed within proximity of Konitzer because of the active SPN order to keep them apart.

Konitzer suggests in her response to defendants' proposed findings of fact that Secretary Hamblin is liable because he "was the final word on inmate complaints that were appealed by the inmate." This is incorrect. Liability under § 1983 must be based on a defendant's personal involvement in the constitutional violation. *Burks*, 555 F.3d at 593-94 (liability depends on defendant's own individual actions and not those of others); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). There is no evidence that Konitzer ever complained to Secretary Hamblin or used the inmate complaint system to complain about threats from Balsewicz before the attack. As a result, Hamblin is entitled to summary judgment on the Eighth Amendment claim against him.

## III. Qualified Immunity

Defendants argue that they are entitled to immunity from liability under the doctrine of qualified immunity, which protects government officials performing discretionary functions from suit if "their conduct 'could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006). In evaluating a claim of qualified immunity, a court conducts a two-step inquiry: (1) whether the alleged conduct violates a constitutional right; and (2) whether that right was "clearly established" at

26

the time of the alleged conduct.  *Id.*  "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

Because I have concluded that Director Nickel, Secretary Hamblin and Officer Becker did not violate plaintiff's Eighth Amendment right to be kept safe, they are not subject to liability and it is unnecessary to consider their qualified immunity defense.

The question remains whether Supv. Mink, Capt. Keller, Officer Fraundorf or Sgt. Martin violated Konitzer's constitutional rights by acting with deliberate indifference to her safety.  If a jury were to find that any of these defendants was aware of specific threats being made against Konitzer but refused to take any steps to protect Konitzer from those threats, then that defendant would not be entitled to qualified immunity.  Long before November 2010, the law was clear that prison officials could not turn a deaf ear to an inmate's pleas for protection from real threats to her safety.  *See, e.g., Farmer*, 511 U.S. 825 (setting forth parameters of right); *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (upholding finding of deliberate indifference where evidence that defendant had been notified of threat against plaintiff and need for transfer but defendant did nothing to effect transfer).  Defendants' defense of qualified immunity will be unavailing should Konitzer prevail on her claims against Supv. Mink, Sgt. Martin, Capt. Keller or Officer Fraundorf at trial.

## IV.  State Law Claims

Defendants raise no issues regarding the merits of Konitzer's state law claims for negligence and instead focus on procedural requirements and their immunity from suit.  Officer

Fraundorf and Secretary Hamblin argue that the claims against them must be dismissed because Konitzer failed to name them in her notice of claim filed with the Attorney General. Wis. Stat. § 893.82(3) states that no civil action may be brought against a state employee unless within 120 days of the event causing the injury, the claimant serves upon the attorney general "written notice of a claim stating the time, date, location and the circumstances of the event . . . and the names of persons involved, including the name of the state officer, employee or agent involved." Both the statute and Wisconsin courts require strict compliance with this requirement. *Roman Catholic Foundation, UW-Madison, Inc. v. Regents of University of Wisconsin Roman Catholic Foundation, UW-Madison, Inc. v. Regents of University of Wisconsin System*, 578 F. Supp. 2d 1121, 1143 (W.D. Wis. 2008); *Riccitelli v. Broekhuizen*, 227 Wis. 2d 100, 116, 595 N.W.2d 392 (1999) (holding substantial compliance insufficient). Because Konitzer failed to name defendants Officer Fraundorf and Hamblin, they are entitled to summary judgment on the state law claims against them.

With respect to Konitzer's remaining state law claims, the State argues that Director Nickel, Sgt. Martin, Supv. Mink, Officer Becker and Capt. Keller are immune from liability under Wis. Stat. § 893.80(4), which Wisconsin courts have interpreted to mean that public officials may not be sued for "any act that involves the exercise of discretion and judgment." *Lodl v. Progressive Northern Insurance Co.*, 2002 WI 71, ¶ 21, 253 Wis. 2d 323, 646 N.W.2d 314 (2002). Although I agree that many of the acts in question could be viewed as discretionary, Wisconsin courts recognize a number of exceptions to immunity, including (1) ministerial duties imposed by law, (2) duties to address a known danger, (3) actions involving professional discretion, and (4) actions that are malicious, willful, and intentional. *Id.*; *Scott v. Savers Property*

28

*and Casualty Insurance Co.*, 2003 WI 60, ¶ 16, 262 Wis. 2d 127, 663 N.W.2d 715 (2003).  In addition, if a defendant's actions were to be found reckless, then that defendant is not entitled to protection under § 893.80(4).  *Noffke ex rel. Swenson v. Bakke*, 2009 WI 10, ¶ 35, __ Wis. 2d. __, 760 N.W.2d 156, 166 (2009).  Reckless conduct "occurs where a participant engages in conduct under circumstances in which (he)(she) knows or a reasonable person under the same circumstances would know that the conduct creates a high risk of physical harm to another and (he)(she) proceeds in conscious disregard of or indifference to that risk."  Wis JI-Civil 2020.

Of obvious relevance to this case are the "known danger" and reckless conduct exceptions.  In *Baumgardt v. Wausau School District Board of Education*, 475 F. Supp. 2d 800, (W.D. Wis. 2007), Judge Crabb discussed the known danger exception and compared it to the ministerial duty exception:

> The known danger exception is fairly self-explanatory and appears to be a subset of the ministerial exception:  when a public official is aware of a dangerous condition that is "clear" and "absolute," his knowledge transforms a discretionary duty into a ministerial duty. . . .  One difference between the known danger exception and the more general exception for ministerial duties is that the former may apply even though the public official has some discretion in determining how to respond to the danger; a "known danger" requires a public official to "do something" to avert harm even if the necessary steps have not been spelled out in advance.

> *Id.* at 809-10.

In a later case, Judge Crabb noted that there was little difference between the known danger and reckless conduct exceptions, reasoning that "[i]f one disregards a dangerous condition that is 'clear' and 'absolute,' for the purpose of the 'known danger' exception, it is likely that he has

29

acted recklessly as well." *Elborough v. Evansville Community School Dist.*, 636 F. Supp. 2d 812, 825 (W.D. Wis. 2009).

Given these standards, I conclude that a reasonable jury could find that defendants Sgt. Martin, Supv. Mink and Capt. Keller meet both exceptions to discretionary act immunity with respect to their failure to take action after learning of Balsewicz's threats, and in Sgt. Martin's case, telling Balsewicz that Konitzer had called him a "fag." As a result, defendants' motion for summary judgment will be denied with respect to the state claims against Sgt. Martin, Supv. Mink and Capt. Keller.

However, for the same reasons discussed in conjunction with the federal claims, a reasonable jury could *not* conclude that Director Nickel or Officer Becker were aware that Konitzer faced a clear and absolute danger. As a result, Director Nickel and Officer Becker are entitled to summary judgment on Konitzer's state claims against them on the ground that they have discretionary act immunity.

## V.  Conclusion

As explained above, the court is granting summary judgment in favor of defendants Nickel, Becker and Hamblin on all the claims against them, and these three defendants will be dismissed from this case. The state law claim against Officer Fraundorf also will be dismissed on procedural grounds. Remaining for trial are the Eighth Amendment and state law claims against Supv. Mink, Sgt. Martin and Capt. Keller and the Eighth Amendment claim against Officer Fraundorf.

Three times before, Konitzer has asked the court to find an attorney for her and three times the court has denied these requests. Now that this lawsuit is headed to trial, I conclude that Konitzer actually requires the assistance of an attorney to present her case to a jury. Accordingly, I am staying proceedings until the court locates a lawyer who is willing to represent Konitzer. This usually takes a while—as in several months—so Konitzer should be patient.

A lawyer agreeing to represent a plaintiff in a case like this one takes the case with no guarantee of compensation for his or her work. Konitzer should be aware that once a lawyer appears on her behalf, the lawyer is her go-between with the court and with opposing counsel. The court will not directly communicate with Konitzer and Konitzer may not communicate directly with the court. Konitzer will have to communicate directly with her lawyer about any concerns and she must allow her lawyer to exercise professional judgment to determine which matters to bring to the court's attention and what motions and other documents to file. Konitzer cannot demand that her attorney raise frivolous arguments and cannot insist that her attorney follow every directive that she makes. Konitzer must be prepared to accept her lawyer's strategic decisions even if she disagrees with some of them. Konitzer must understand that if she cannot cooperate or chooses not to cooperate with the attorney the court finds for her, then it is highly unlikely that the court will recruit another lawyer to represent her in this lawsuit.

ORDER

IT IS ORDERED that:

(1)     The motion for summary judgment filed by defendants (dkt. 155) is
        GRANTED in part and DENIED in part.

        a.      The motion is GRANTED with respect to the Eighth
                Amendment claims against defendants Nickel, Becker and
                Hamblin and the state law negligence claims against Nickel,
                Becker, Fraundorf and Hamblin.

        b.      The motion is DENIED with respect to plaintiff's Eighth
                Amendment claims against defendants Mink, Martin,
                Keller and Fraundorf and plaintiff's state law claims against
                defendants Mink, Martin and Keller.

(2)     Plaintiff Konitzer's motion that defendant Martin not be permitted
        discretionary immunity (dkt. 249) is DENIED as an untimely response to
        defendants' summary judgment motion.

(3)     Plaintiff's request for assistance in recruiting counsel to represent her in
        this case (dkt. 188) is GRANTED.  Further proceedings in this case
        remain STAYED pending the recruitment of counsel for plaintiff.  Once
        the court finds counsel willing to represent plaintiff, the court will advise
        the parties and hold a status and scheduling conference.

Entered this 27th day of September, 2013.

                                BY THE COURT:

                                /s/

                                STEPHEN L. CROCKER
                                Magistrate Judge